## In re SPERLING.

### SPERLING v. CUDAHY PACKING CO.

### No. 492.

Circuit Court of Appeals, Second Circuit.

July 9, 1934.

Bernard Fliashnick, of New York City, for bankrupt-appellant.

Rubin Cohen, of New York City (Herbert Miller, of New York City, of counsel), for objecting creditor-appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Benjamin Sperling was adjudicated a bankrupt on January 26, 1933, and on March 15 of that year petitioned for a discharge. The Cudahy Packing Company, a creditor, filed two specifications of objection as follows:

"First.—That the bankrupt has failed to explain satisfactorily any loss of assets or deficiency of assets to meet his obligations, in that the bankrupt scheduled his merchandise obligations in the sum of $26,109.50, and no assets, and has failed to explain his loss of assets and deficiency of his assets to meet his obligations.

"Second.—That the bankrupt has failed to keep books of account or records from which his financial condition and business transactions might be ascertained; and/or if kept, has failed to produce the same, and has se-

creted or destroyed the same from which his financial condition might be ascertained, and without which the financial condition of the bankrupt could not be satisfactorily discovered by this objecting creditor."

The referee sustained each specification of objection to the discharge, and his report was confirmed.

■ About two years before the filing of the petition in bankruptcy, Sperling conducted a business of buying and selling meat at four stores in Brooklyn. He testified that he had been in partnership with his brother at these stores and bought out the latter, paying him $5,000 in cash, and put in $10,000 of his own money to dispose of certain bills that were owing. He also said that each store was mortgaged and the restaurants he had were closed down one after another, so that he could not meet his obligations. He added that, during a time when he was sick and away from his business, a creditor named Gobel, to whom he owed about $1,700, served a summons on him and sold him out on an execution sale through a city marshal. He testified that he kept a full set of books, and was confirmed in this by the testimony of the woman who was formerly his bookkeeper and is now the bookkeeper of the G. & H. Meat Market, a corporation by which he is employed and of which his brother-in-law Solomon is the treasurer. The books were called for by the referee, but the bankrupt and the bookkeeper each testified that they were never seen after the time of the execution sale when the bankrupt was ill at home.

Upon the foregoing record, we can see no justification for the finding of the referee that the bankrupt kept no books of account, and regard the second specification as one that should not have been sustained. But the first specification is quite a different matter. Section 14 of the Bankruptcy Act as amended by Act May 27, 1926, § 6 (11 USCA § 32) provides that:

"(b) The judge shall hear the application for a discharge and such proofs and pleas as may be made in opposition thereto * * * and investigate the merits of the application and discharge the applicant, unless he * * * (7) has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities: Provided, That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this paragraph (b), would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt. * * * *"

■ Now, it seems quite evident that the bankrupt did not explain satisfactorily his "deficiency of assets to meet his liabilities." In the first place he only testified to generalities in the most sketchy way. When asked to classify his debts scheduled at $28,554.62, he enumerated certain obligations amounting to $2,445.12 which apparently represented rents in the sum of $1,150, a bill for electricity of $365, and other items, not due merchandise creditors, aggregating $930.12. These left remaining $26,109.50 which he attributed to merchandise creditors. Nothing appears due on mortgages on which he laid so much stress in explaining the capture by creditors of the four stores which he had occupied. He was asked during how long a period this sum of $26,109.50, due merchandise creditors, accrued, and replied: "About four weeks or so." To be sure, when afterwards asked to explain why such an indebtedness, with no assets to meet it, had arisen in such a short time, he said that "it took years" to accumulate the indebtedness and that "Business was bad and we couldn't meet the obligations." But he never made the slightest explanation of his former statement that the indebtedness to merchandise creditors accrued within only "four weeks or so."

Moreover, while the bankrupt showed that he kept books of account, his explanation for not producing them was unsatisfactory. He and his bookkeeper attributed their loss to the city marshal, but he proved no real attempt to find them, and contented himself with rather vague explanations. He was asked about their whereabouts when under examination in supplementary proceedings in August, 1932, and said only: "I don't know * * * The accountant I had still works for my brother." It is noticeable that the story that the books were last seen at the time of the execution sale by the marshal was not given then. Some months later, at the first creditors' meeting, he told the referee that "The Marshal wouldn't give me a chance to look for them." What that meant, when he is supposed to have been sick at home at the time of the sale, is not explained. In some way he was able to make out schedules showing $28,554.62 of debts. How he collected all the items without any records is hard to see. His only explanation was: "I have seen some of the bookkeepers in the market and they gave me some of the amounts." His inability to explain in detail his loss of assets is rendered all

the more suspicious by the inadequate explanation of his failure to produce his books.

A pleasure car and truck, which the bankrupt did not schedule, are items of which he gave an unsatisfactory explanation. He said that the pleasure car "was disposed of when they took my business away" and that his brother-in-law Solomon "has" it. Later he said that Solomon only had the truck. This truck, which originally belonged to the bankrupt and was used in his business, is now used in the business of the G. & H. Meat Market—a corporation organized shortly after Sperling's stores were closed and of which he is the purchasing agent and Solomon the treasurer. The best explanation he gave for the acquisition of the truck by this corporation was: "They bought the business, I suppose. * * * They bought it at public auction." He made the same vague explanation about the disposition of the fixtures in his stores. He was asked whether his fixtures were now in the possession of the G. & H. Meat Market. His answer was, "No," but, when pressed as to whether the fixtures had not been seen in the G. & H. Market Knickerbocker avenue store, said: "Well, there wasn't much to see, fixtures is fixtures. I cannot swear they were mine or somebody else's. They all look alike. Nothing to see in a butcher shop but a showcase, ice box and a few scales and you will see that in any other store."

It appears from the above that the bankrupt has not satisfactorily explained why the truck and pleasure car and fixtures were not among his assets and were not made available for his creditors. It was not enough to say that he supposed the corporation bought the truck "at public auction," that Solomon had the pleasure car, and then that he did not have it, and, in respect to the fixtures: "Fixtures is fixtures. I cannot swear they were mine or somebody else's." This is particularly true when the bankrupt's brother-in-law Solomon is treasurer of the G. & H. Meat Market and the bankrupt himself is purchasing agent and, in the absence of Solomon, its manager. The same thing is true as to the generalities and contradictions he offered when attempting to explain the time when his indebtedness accrued and what became of the proceeds realized from merchandise obligations amounting to $26,109.50.

When section 14 of the Bankruptcy Act was amended in 1926 so as to preclude a discharge if a bankrupt "has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities," we think Congress meant to require much more in the way of explanations than vague generalities. If the bankrupt's illness resulted in the loss of books from which he might offer better explanations than he has, that fact might lessen his obligation to make as detailed an explanation as though the books were available. But he has accounted very poorly for failing to produce his books and is open to suspicion for leaving his creditors without the ordinary means for verifying the truth of even his vague explanations or definitely showing them to be false. Assuming that the books totally disappeared at the time of the execution sale, the bankrupt made no effort to prove by competent evidence how he lost title to his truck and fixtures. He could have called Solomon and the city marshal instead of basing his explanations on nothing more than his own unverified speculations.

The order in so far as it denies the discharge of the bankrupt is affirmed.