In re Gary S. BLONDER, Debtor.

Anthony S. Novak, Trustee, Plaintiff,

v.

Gary S. Blonder, Defendant.

Bankruptcy No. 90–21344.
Adversary No. 91–2210.

United States Bankruptcy Court,
D. Connecticut.

Feb. 15, 2000.

Walter J. Onacewicz, Hank Hoffman, Martin W. Hoffman, Law Offices of Martin W. Hoffman, West Hartford, CT, for Defendant–Debtor.

Edward C. Taiman, Jr., Sabia & Hartley, LLC, Hartford, CT, for Plaintiff–Trustee.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

### I.

### ISSUE

This ruling deals with a Chapter 7 trustee's complaint which alleges that the debtor, Gary S. Blonder, ("the debtor"), should be denied a discharge pursuant to Bankruptcy Code § 727(a)(3)[1] for the debtor's failure to keep adequate business records (Third Count), and pursuant to § 727(a)(5)[2] for his failure to explain a loss of assets (Fourth Count). Although the four-count complaint also requests denial of the discharge under § 727(a)(2)(A) (for debtor's fraudulent prepetition transfer of property) (First Count) and under § 727(a)(2)(B) (for debtor's fraudulent postpetition transfer of property) (Second Count), the court will forgo resolving these two counts in light of its conclusion that the trustee is entitled to judgment on the Third and Fourth Counts.

### II.

### BACKGROUND

#### A. Procedural Background

Creditors, on June 29, 1990, filed an involuntary petition for a case under Chapter 7 against the debtor. The court, on September 10, 1990, entered an order for relief on the petition. On the debtor's motion, the court, on September 13, 1990, converted the case to one under Chapter 11, with the debtor becoming debtor-in-possession. The court, on April 18, 1991, reconverted the debtor's case to one under Chapter 7, and Thomas M. Germain ("Germain") was appointed Chapter 7 trustee.

Germain, on August 2, 1991, filed the complaint against the debtor objecting to the granting of the debtor's discharge. Anthony S. Novak, Esq. ("Novak") in March, 1993 replaced Germain as successor trustee and as the plaintiff in this litigation. The court, after considerable delay, including an appeal to the district court and a denied motion for summary judgment, held a trial on the complaint on August 1 and August 4, 2000. The parties thereafter submitted their memoranda of law.

#### B. Facts

The debtor at all times concerned operated numerous corporations which he wholly owned—Blonder Associates, Inc. ("BAI"), Allied Scrap Iron & Metal Corp., GSB Charters, Ltd., Blonder Franchise Systems, Inc., Windsor Street Development, Inc., GSB, Inc., Blonder's of Florida, Inc., and Blonder Marine and Charter, Inc. The debtor, both individually and through these corporate entities, had, since 1975, engaged in the businesses of buying, selling, and brokering luxury automobiles, yachts, furniture and antiques, buying, selling and developing real property, and chartering yachts. The debtor at some point was appointed to the board of directors of a Connecticut financial institution, Landmark Bank.

The debtor's bankruptcy schedules listed total claims of $36,670,816.76. They include $30,609.95 for priority taxes, $7,156,001.00 for secured claims and

---

**1.** 11 U.S.C. § 727(a)(3) states that:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

**2.** 11 U.S.C. § 727(a)(5) states that:

(a) The court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

$29,484,205.81 for unsecured claims. The debtor scheduled assets in excess of $5,988,944.57—including $2,500,000.00 of real property (the debtor's residence), $600,000.00 of "inventory," identified simply as "automobiles, antiques," $191,952.00 in liquidated claims, $2,280,748.00 of contingent and unliquidated claims (including "in excess of" $1,000,000.00 for "potential preference claims"), a $180,000.00 stock interest in Landmark Community Bank Corp., Inc., a $1.00 interest in each of the corporations listed *supra* as wholly owned by the debtor, and $135,000.00 in partnership interests.

The debtor, in his statement of financial affairs, listed his monthly salary at $33,333.00. The statement of affairs also notes:

> Debtor, in late 1989, transferred approximately $1,377,000 in antiques, paintings, and other collectibles to Blonder Associates, Inc. in repayment of a debt of approximately $2,000,000.

Germain, on June 13, 1991, filed a two-count complaint against BAI to avoid the transfer of these assets ("the BAI antiques") as a preferential or constructively fraudulent transfer. The court subsequently entered a stipulated judgment against BAI on both counts. The debtor testified that there never had been a physical transfer of the BAI antiques to BAI because at all times the BAI antiques were located at the debtor's residence, commingled with other antiques owned personally by the debtor and antiques owned by his former wife.

Novak arranged for the removal and storage of all antiques, including both BAI antiques and other antiques owned by the debtor, from the debtor's residence. He then retained Robert H. Glass ("Glass"), a licensed auctioneer with thirty years experience in auctioning antiques and collectibles. Glass testified that on September 14, 1993 he conducted a public auction of

these antiques at which 300 to 400 people were in attendance. The auction yielded approximately $150,000 for the estate, after deduction for commissions and expenses.[3] Glass stated that he believed fair value was received for the antiques.

The debtor conceded at trial that invoices (Ex. 6) for some 60 percent of the items sold at the auction existed and that they constituted the only inventory records he had for such antiques. He stated that his indebtedness to BAI resulted from his practice of drawing funds from BAI for his personal use with such transactions documented by entries in a BAI document entitled "Due from Shareholder Account Detail." (Ex. 1.) The debtor produced a BAI handwritten, undated worksheet for the quarter ending December 31, 1989, showing a journal entry debiting BAI's inventory for "antiques" and crediting its "due from officer" account by $1,377,046 with the notation that it was a "partial paydown of debt by officer w/ antiques." (Ex. 3.)

### III.

### CONTENTIONS OF THE PARTIES

Novak contends that, while the debtor valued the BAI antiques at $1,377,000, the debtor possessed insufficient records to support any valuation or identification of the antiques. The auction netted the estate only about $150,000 for both the BAI antiques and the debtor's other antiques, leaving a discrepancy of over $1,000,000. Novak argues that the debtor did not keep or preserve any inventory records to enable a trustee to trace either the BAI antiques or the debtor's antiques, and that, without such records, the debtor should be denied a discharge under § 727(a)(3) for the failure to keep and maintain adequate records, and under § 727(a)(5) for his failure to adequately explain a loss of assets.

---

**3.** In separate sales, the estate also received approximately $125,000 from the sale of two

vintage automobiles that the debtor owned.

The debtor argues that he "was not a sophisticated investor," that "he had no formal education past high school" and that his lack of records is understandable under the circumstances. (Debtor's Mem. at 12.)[4] He also argues that due to Glass' inexperience and incompetence both in the advertising and in the conduct of the auction, Glass sold the antiques for only a fraction of their value, thereby accounting for the loss of assets.

## IV.

### DISCUSSION

#### A. Failure to Keep Adequate Business Records—§ 727(a)(3)

■ "The fundamental policy underlying § 727(a)(3) is to ensure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 837 (Bankr.E.D.N.Y.2000) (citations omitted); *see also In re Underhill*, 82 F.2d 258, 260 (2d Cir.1936), *cert. denied*, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936) (applying the corresponding provision under the former Bankruptcy Act). "[O]nce the plaintiff has satisfied its burden of going forward with the evidence by showing that the debtor does not have sufficient records ... the burden of producing additional credible evidence to rebut ... or to justify the absence of records, shifts to the debtor." *United States Fidelity & Guaranty v. Delancey (In re Delancey)*, 58 B.R. 762, 767 (Bankr. S.D.N.Y.1986); *See also Sethi*, 250 B.R. at 838 ("Although the plaintiff has the burden of proving the inadequacy of the debtor's

records, it is the debtor who has the obligation of producing financial records in the first place...."). "Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statement or explanations made by the bankrupt." *Underhill*, 82 F.2d at 260.

■ The decision of whether to deny a discharge based on the inadequacy of the debtor's recordkeeping is a matter of judicial discretion applied after consideration of the relevant facts and circumstances.

The standard for evaluating the adequacy of a debtor's record keeping enunciated by the Second Circuit in *Underhill* is applicable today.... "It is a question in each instance of reasonableness in the particular circumstances." ... When examining the debtor's circumstances, courts have focused on factors including the following:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;

2. The amount of the debtor's obligations;

3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;

4. The debtor's education, business experience and sophistication;

5. The customary business practices for record keeping in the debtor's type of business;

6. The degree of accuracy disclosed by the debtor's existing books and records;

7. The extent of any egregious conduct on the debtor's part; and

---

4. When asked to explain the transfer to BAI, the debtor responded:

> Well, during the year, as I mentioned before, when I went out and I bought antiques, I would have gone ahead and purchased the antiques and transferred them to Blonder Associates; therefore, Blonder Associates would owe me money, and, in turn, I would take a turn, and I owed it money. To reduce my debt to the corporation, I transferred all of what I had in inventory in total at that time through a journal entry at the end of the year, but the transfers were made during the course of the year, each individual sale.

(Tr. of Aug. 4, 2000 at 13–14.)

8. The debtor's courtroom demeanor.

*Sethi,* 250 B.R. at 838.

■ Novak, by letter dated May 7, 1993 (Ex. S), wrote to the debtor requesting detailed information as to antiques owned by the debtor, antiques he transferred prepetition to BAI, their values, their purchase prices, the dates of purchase, and their present locations. Novak testified that the debtor never furnished him with any of that information.[5] In interrogatories dated December 16, 1994, which Novak propounded, the debtor was asked:

No. 7 Identify all documents executed by the [debtor], individually in connection with the transfer of the antiques, paintings and other collectibles to [BAI] . . . .

The debtor responded:

None could be located at this time.

(Ex. D.)

■ The debtor had a duty to keep and preserve inventory records sufficient to enable a case trustee to identify each of the antiques at issue, to determine as of the date of the involuntary petition which were owned by the debtor and which were included in the transfer to BAI, and to provide the basis for their valuations. The court is unconvinced by the debtor's claim that he lacked the education, experience and sophistication to maintain an inventory of his assets. That the debtor lacked formal higher education is only one of many considerations to be weighed. The debtor, both individually and through a myriad of interrelated corporations he owned and controlled, was engaged in the businesses of buying and selling high-end antiques and collectibles—including furniture, paintings, oriental carpets, and vintage automobiles—as well as luxury yachts and real property. The debtor testified that he had handled several transactions that involved in excess of a million dollars. The debtor acknowledged that he had "many, many years" of experience in both the antiques and automotive businesses. (Tr.

of Aug. 4, 2000 at 14, 53.) A Connecticut bank considered him qualified to sit on the bank's board of directors.

Both parties presented the testimony of expert witnesses on the usual accounting practices of closely held businesses. Richard Finkel, the trustee's expert accountant, testified that, in an intercompany transfer of the magnitude here involved, the transaction should be documented by at least a list of the items transferred, preferably with appraisals. While Richard Merrick, the debtor's expert accountant, testified that it was not typical for an intercompany transfer between small, closely held corporations to be supported by an "inventory along with appraisals," he conceded that his experience included very few ("less than a handful") instances involving shareholder loans of the magnitude of $2,000,000 (Tr. of Aug. 1, 2000 at 265–267). Merrick acknowledged that hypothetically, such an entity "should keep a detailed list . . . the date they bought them, a description of the asset, the purchase price, and probably for insurance purposes, they should also have a current appraisal done. . . ." (Tr. of Aug. 1, 2000 at 273.)

■ The debtor argues that he used the invoices from his purchases of antiques as his inventory and that no other documents were needed. The court is unpersuaded. To start with, the debtor submitted invoices for only 60 percent of the antiques taken from his residence. These invoices provide no information whatever about the remaining 40 percent of the items auctioned, nor do they identify or account for additional BAI antiques not located by the trustee. In addition, the invoices do not clearly indicate whether an item was sold to the debtor in his individual capacity or to BAI. The debtor argues that he could tell who the buyer was by the shipping address on the invoice. This argument is unhelpful to the debtor. It is well settled that "the burden of keeping comprehensi-

---

5. The debtor produced the invoices 3 days before trial. (Tr. of Aug. 1, 2000 at 142.)

ble records is upon the Debtor. [A trustee] is not required to sift through voluminous receipts and scraps of paper in order to trace assets." *Aid Auto Stores, Inc. v. Pimpinella (In re Pimpinella )*, 133 B.R. 694, 699 (Bankr.E.D.N.Y.1991) (citing *In re Morando,* 116 B.R. 14, 16 (Bankr. D.Mass.1990) (that trustee need not sift through a "rat's nest" of papers to decipher the debtor's finances)). These invoices do not satisfy the Second Circuit's requirement of "records of substantial completeness and accuracy ... [that] may be checked against the mere oral statement or explanations made by the bankrupt," *Underhill,* 82 F.2d at 260.

The court concludes that the debtor has neither rebutted Novak's claim of inadequate records nor justified their absence. The court further concludes that, based upon its analysis of the relevant factors, the debtor be denied a discharge under § 727(a)(3) for his failure to keep or preserve sufficient records to enable a trustee to determine the market value and location of antiques either transferred to BAI or owned by the debtor and included in the description of "automobiles, antiques."

### B. Loss of Assets—§ 727(a)(5)

■ Because the transfer of antiques to BAI was avoided, the transferred assets are property of the estate. Based on the information supplied by the debtor in his bankruptcy petition, the value of those assets was approximately $1,377,000. The debtor has testified that all antiques owned by BAI, as well as $600,000 of automobiles and antiques he owned personally, were located at his residence. The public auction of the antiques netted only about $150,000 and the sale of the cars about $125,000 for the estate. Novak has, therefore, met his burden of establishing that, based on the discrepancy in the values provided by the debtor, there has been a loss of approximately $1,700,000 of assets. The burden then shifts to the debtor to satisfactorily explain the loss. *Hawley v. Cement Industries, Inc. (In re*

*Hawley* ), 51 F.3d 246, 249 (11th Cir.1995). He has failed to do so.

The debtor argues that Novak's choice of an auctioneer resulted in the items at issue being sold for considerably less than their market values. To support his argument, the debtor compared selected items sold at auction with invoices allegedly for those items. The documentation in support of this explanation is incomplete at best. As noted in the discussion *supra,* the debtor failed to maintain an inventory of the antiques and he acknowledged in his testimony that he was able to locate receipts for only 60 percent of the items sold at auction. The court fully credits the testimony of the auctioneer and concludes that a proper auction was conducted and fair value received.

The debtor failed to account for the remaining 40 percent of the items auctioned and for items that were not located by Novak. The debtor offered no explanation for the former. Regarding the latter, the debtor stated that, antiques were constantly being bought and sold, but he offered no records or other documentation to show what items were bought or sold or what happened to the proceeds of such sales.

■ "It has long been the rule in the Second Circuit that a debtor's satisfactory explanation of a loss of assets ... requires 'much more in the way of explanations than vague generalities.' A vague, indefinite and uncorroborated hodge-podge of financial transactions will not suffice under 11 U.S.C. § 727(a)(5) for an adequate explanation of the loss or deficiency of assets." *Scarsdale Nat'l Bank & Trust Co. v. Switzer (In re Switzer )*, 55 B.R. 991, 998 (Bankr.S.D.N.Y.1986) (quoting *Sperling v. Cudahy Packing Co. (In re Sperling )*, 72 F.2d 259, 261 (2d Cir.1934)). The court concludes that the debtor has not satisfactorily explained the loss of assets and further concludes that the debtor should be denied a discharge under § 727(a)(5).

## V.

### *CONCLUSION*

In accordance with the foregoing discussion, the court concludes that a judgment enter that the debtor be denied a discharge pursuant to § 727(a)(3) for his failure to keep and preserve adequate records, and pursuant to § 727(a)(5) for his failure to satisfactorily explain the loss of assets.